THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

RENEE DAWN WILLIS,

     Plaintiff,

v.                                                      CIVIL ACTION NO. 5:22-cv-00074

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Renee Dawn Willis ("Claimant") seeks review of the final decision of the Commissioner of Social Security ("Defendant" or the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on February 15, 2022, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Opening Brief (ECF No. 14), the Commissioner's Brief in Support of Defendant's Decision (ECF No. 19), and Claimant's reply brief (ECF No. 24). Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse

the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm her decision (ECF No. 19), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.   BACKGROUND

### A.  Information about Claimant and Procedural History of Claim

Claimant was 39 years old at the time of her alleged disability onset date and 44 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 455, 466.)[1] Claimant has a High School Diploma, and has worked in the past as a toll collector, cashier, and server/bartender. (Tr. 202, 528-31, 604, 1478.) Claimant alleges that she became disabled on June 2, 2016, due to seizures, problems with her spine, and radial tunnel syndrome. (Tr. 202, 455, 459, 466, 528-31, 604.)

Claimant filed applications for DIB and SSI benefits on January 6, 2017. (Tr. 455-465.) Her claims were initially denied on May 24, 2017, and again upon reconsideration on October 31, 2017. (Tr. 46.) Claimant filed a written request for hearing on December 28, 2017, which resulted in an unfavorable decision by ALJ Sabrina M. Tilley on February 4, 2020 (the "initial decision"). (Tr. 207-228.) Claimant requested Appeals Council review of the initial decision on February 4, 2020. (Tr. 46.) The Appeals Council subsequently granted Claimant's request.

On review, the Appeals Council noted that Claimant filed her claim before March 27, 2017; consequently, older regulations applied, and required the ALJ to explain in her written decision the weight she assigned to each medical opinion. (Tr. 46.) Because the ALJ's initial decision did not explain the weight the ALJ assigned to the medical opinions of record, the Appeals Council vacated the initial decision and remanded the matter for

---

[1] All references to "(Tr.)" refer to the Transcript of Proceedings filed in this action at ECF No. 12.

further proceedings. (Tr. 46-47.) The Appeals Council instructed the ALJ to give "further consideration" to Claimant's maximum residual functional capacity during the entire period at issue, providing "rationale with specific references to evidence of record in support of assessed limitations." (Tr. 46.) Additionally, the Appeals Council instructed the ALJ to—in providing her rationale—evaluate the treating and non-treating source opinions pursuant to the provisions of 20 C.F.R. §§ 404.1527 and 416.927, and explain the weight given to such opinion evidence. (Tr. 46.) Finally, the Appeals Council ordered the ALJ to "offer the Claimant an opportunity for a hearing." (Tr. 46.)

A telephonic administrative hearing was held before ALJ Tilley on April 7, 2021, at which time Claimant and vocational expert William Tanzey testified. (Tr. 47.) Claimant was represented by counsel Shawn A. Taylor during the hearing. (Tr. 47.) On June 8, 2021, ALJ Tilley rendered an unfavorable decision once again (the "ALJ's decision"). (Tr. 43-59.) Claimant then sought review of the ALJ's decision by the Appeals Council; however, the Appeals Council denied Claimant's request for review on December 16, 2021, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-2, 16.)

Claimant brought the present action on February 14, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer and a transcript of the administrative proceedings on May 5, 2022. (ECF Nos. 11; 12.) Subsequently, Claimant filed her Opening Brief and the Commissioner filed her Brief in Support of Defendant's Decision. (ECF Nos. 14; 19). Plaintiff then filed a reply to Defendant's Brief as permitted by Rule 9.4(a) the Court's Local Rules of Civil Procedure. (ECF No. 24.) As such, this matter is now fully briefed and ripe for adjudication.

### B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it in relevant part here for the convenience of the United States District Judge.

#### i. *Spine Conditions*

Claimant has degenerative-disc disease of the spine, with related neck and back pain. Medical imaging of Claimant's cervical spine from April 22, 2015 found early degenerative-disc disease at C6-C7 and slight reversal of the lower cervical curvature. (Tr. 673.) Claimant's treatment for her associated neck and back pain was conservative and consisted of moist compresses, ice packs, an inversion table, physical therapy, and injections—none of which were successful in alleviating Claimant's back pain. (Tr. 101-102, 121, 151, 1398, 1443 1531-32.) She was prescribed Tylenol Three with Codeine, Neurontin for nerve pain, muscle relaxers, and anti-inflammatory medications; Claimant reported that the medication helped at times, but that her pain persisted. (Tr. 1531, 1538.) Claimant testified that ultimately her doctors told her she was not a candidate for surgery. (Tr. 120-21.)

On July 8, 2016, Claimant presented to her primary care provider for follow-up and reported that chiropractic treatment resulted in only minimal improvement, and that the medication prescribed for her tension headaches was not helping. (Tr. 1158.) She was diagnosed with a tension headache and advised to pursue massage therapy; additionally, medical imaging was ordered. (Tr. 1159.)

Between September 2016 and December 2016, Claimant returned to her primary care provider for follow-up on her neck pain, headaches, and abdominal pain. (Tr. 1121.) She reported seeing a chiropractor on and off for the past year for neck pain, but with no

4

improvement. (Tr. 1117.) She reported that she was currently pain-free, but when she experienced pain, it had radiated from the neck into the shoulders with occasional paresthesia of the right hand. (Tr. 1117.) Claimant reported that her neck pain was at a one on a scale of ten, and expressed that she felt she was able to return to work at that time. (Tr. 1114-1115, 1123.) She did report, however, that she was having recurrent headaches with increased severity of throbbing pain, along with light sensitivity. (Tr. 1114-1117.) She reported a sixty-pound weight gain over the past year as well. (Tr. 1117.) On examination, Claimant was oriented with intact memory and judgment, and a normal mood and affect. (Tr. 1117-1118.) She was diagnosed with a tension headache and hand paresthesia. (Tr. 1118.) Claimant's provider completed disability insurance forms for her, prescribed over-the-counter Sudafed, ordered an MRI of the cervical spine, and instructed Claimant to return if there was no improvement or worsening signs and symptoms. (Tr. 1116.) Claimant was also instructed to exercise daily and to apply warm, moist heat to the posterior neck for her tension headaches. (Tr. 1119.)

On September 6, 2016, Claimant presented to Surgical Care of Southern West Virginia. (Tr. 1042-43.) On examination, Claimant showed normal motor strength and tone, with normal movement of all extremities, as well as a normal gait and station. (Tr. 1042-43.)

On September 28, 2016, x-ray imaging of Claimant's cervical spine indicated mild spondylitic changes in the lower cervical spine that could be secondary to muscle spasm in the lower neck. Clinical correlation was recommended. (Tr. 1103.) The MRI occurred on October 30, 2016, and the impression was moderate broad-based C5-C6 protruding disc extending into the neural foramina bilaterally. (Tr. 1104-1106.) On November 16, 2016, Robin Adkins, N.P. diagnosed Claimant with cervical intervertebral disc protrusion

based upon the MRI results. (Tr. 1110-1112.) N.P. Adkins referred Claimant to neurosurgeon Panos Ignatiadis, M.D. with St. Mary's Radiology for neck pain, hand numbness, and gastrointestinal problems. (Tr. 1100.)

On December 14, 2016, Claimant presented to Dr. Ignatiadis; he noted that Claimant walked in without any assistance, and reported that she could perform the activities of daily living independently. (Tr. 1100-1101.) He noted Claimant's personal history included frequent or recurring headaches. (Tr. 1101.) On examination, Dr. Ignatiadis found that Claimant had excellent strength of the upper extremities, along with a normal gait and cadence and normal arm swing; she denied any radiculopathy and was able to touch the tip of her toes with the tip of her fingers, although she complained of back pain continuously. (Tr. 1101.) Dr. Ignatiadis found that Claimant had radiculopathy on the right knee due to decreased knee reflex. (Tr. 1101.) Additionally, he reviewed Claimant's MRI of the cervical spine, which showed evidence of moderate compromise of the foramina bilaterally at C5-C6 and C6-C7; however, Dr. Ignatiadis found that this was not sufficient to account for Claimant's reported symptoms of hand numbness. (Tr. 1101.) Dr. Ignatiadis assessed carpal tunnel syndrome and cervical radiculopathy. (Tr. 1102.) He suspected carpal tunnel as an occupational disease, and stated that Claimant needed to have a nerve-conduction study. (Tr. 1102.) Dr. Ignatiadis recommended physical therapy as well as an MRI of the lumbar spine to exclude the possibility of radiculopathy.

On December 15, 2016, Claimant presented to Sarah Cales, P.A., for follow-up. (Tr. 1108-09.) Claimant conveyed Dr. Ignatiadis's opinion that she does not need any surgery for the herniated disc in her cervical spine, but also advised that she should have an MRI of her lumbar spine. (Tr. 1109.) Claimant reported numbness in her right hand, chronic low back pain, a difficult time sitting in her chair at work, and the inability to lie flat on

her back. (Tr. 1109.) P.A. Cales diagnosed Claimant with abnormal reflex and right hip pain, and ordered an x-ray of Claimant's low back and right hip. (Tr. 1107-1109.)

On January 3, 2017, x-ray imaging indicated minimal degenerative changes and scoliosis of the thoracic spine. (Tr. 1104-1105.) However, no fracture was seen, Claimant's disc spaces were normal, and there was no sclerotic or osteolytic lesion. (Tr. 1105.) The impression was minimal scoliosis and minimal degenerative changes of the thoracic spine. (Tr. 1105.) Similarly, a January 2017 MRI of Claimant's lumbar spine showed no acute change; a protrusion was found at L4-L5, causing right L5 lateral recess stenosis and mild canal stenosis. (Tr. 1238.) The impression was spondylosis without myelopathy or reticule apathy-lumbar region, as well as chronic low-back pain with minor lumbar spondylosis. (Tr. 1238.) There was no indication for surgical intervention, and it was recommended that Claimant speak to her primary-care physician about routine use of an over-the-counter anti-inflammatory medication, along with physical therapy and possibly pain management; there was no scheduled follow up. (Tr. 1238.) Subsequently in April 2017, Claimant was observed performing "excellent toe and heel walking." (Tr. 1237.)

On May 1, 2017, Claimant presented to Angela Elkins, PA-C with the Beaver Family Clinic to discuss possible disability due to neck and back pain. (Tr. 1259.) Claimant reported that she attended physical therapy and was unable to move her right arm the next day due sharp radiating pain; she also had an increase of pain in her neck and low back after two hours of standing. (Tr. 1259.) A massage provided some relief. (Tr. 1259.) Additionally, Claimant reported that she was "unable to mentally function" taking the Robaxin and Tylenol 3 in order to work. (Tr. 1259.) On examination, it was noted that Claimant had generalized tenderness of the cervical lower thoracic and lumbar muscles, as well as a limited cervical range of motion and stiffness. (Tr. 1260.) Claimant was

referred to a specialist and advised to follow up in one month. (Tr. 1260.) Bella Zinzuwadia, M.D. reviewed PA Elkins's note and endorsed the plan on May 2, 2017. (Tr. 1260.)

On May 9, 2017, Claimant presented to Robert J Crowe, M.D. of Neurological Associates, Inc. on referral from Bella Zinzuwadia, M.D., for evaluation of Claimant's chronic low-back pain with minor lumbar spondylosis. (Tr. 1236.) Claimant reported that she has had symptoms involving her entire lumbar spine and lumbosacral area "for a number of years, at least decades." (Tr. 1236.) She reported worsening symptoms over the last two years, involving pain in the midline, low lumbar area that radiates into the right posterior hip. (Tr. 1236.) On examination, Claimant's range of motion showed normal flexion and extension. (Tr. 1236-37.) There was no midline pain, trigger point, or spasm. (Tr. 1238.) Claimant's straight-leg raise and cross-straight-leg raise were negative, and was intact in the bilateral lower extremities on a motor examination. (Tr. 1238.) Dr. Crowe found that Claimant did not describe radiculopathy or myelopathy despite her chronic pain involving the thoracic and cervical area. (Tr. 1236.) Claimant was prescribed physical therapy and a course of over-the-counter anti-inflammatory medication. (Tr. 1236.)

On May 24, 2017, Claimant presented to Andrew Thymius, D.O., for an initial consultation regarding neck pain. (Tr. 1250.) Claimant reported numbness in the right hand and pain and weakness in the right-upper extremity and neck. (Tr. 1250.) Claimant reported that treatment had not improved her pain, and that physical therapy had in fact worsened her pain. (Tr. 1250.) Imaging found there was disc pathology of Claimant's cervical spine, resulting in nerve-root irritation and compression. (Tr. 1250-51.) Claimant was advised to undergo epidural steroid injections as a therapeutic and diagnostic

modality to identify and possibly treat the generator of her pain. (Tr. 1251.) Claimant was scheduled to follow up in two weeks for the epidural procedure. (Tr. 1251.)

Imaging of Claimant's lumbar spine from April 2018 showed little change, finding mild-to-moderate neural-foraminal narrowing, and mild-to-moderate degenerative changes. (Tr. 1343.) On June 4, 2018, Claimant presented to Erica A. Hanshew, FNP-BC for follow-up on her lumbar radiculopathy, tension headaches, and cervical disc disorder; Claimant reported she was complying with her medications, and experienced no side effects. (Tr. 1353.) She was prescribed Flexeril and Neurontin. (Tr. 1353.) On November 16, 2018, Claimant presented to Angela Elkins, PA-C, where it was noted that Claimant continued taking Flexeril and Neurontin once daily. (Tr. 1362-63.)

On July 2, 2019, Deanna Conley, FNP-BC noted in her examination findings that Claimant's motor strength was "normal in all limbs," with no abnormal movements, spasticity, or atrophy, and a normal gait and station. (Tr. 1438-39.) Claimant reported a forty-pound weight gain from her Depakote medication, but denied any other side effects from her medications. (Tr. 1436-1438.) Similarly, on November 2, 2019, Darshan Dave, M.D., noted in his examination findings that Claimant's motor strength was "normal in all limbs" with "no abnormal movements." (Tr. 1429-30.) Claimant was seen by neurology on October 28, 2019, where it was noted that Claimant again reported weight gain from her Depakote medication; however, Claimant reported no other side effects. (1426-1430.)

On July 30, 2020, Dr. Zinzuwadia diagnosed Claimant with sciatic leg pain and ordered imaging of Claimant's spine. (Tr. 1539.) An x-ray of the cervical spine taken on August 25, 2020, found "no significant scoliotic curvature of the cervical spine." (Tr. 1543.) The x-ray also revealed "straightening of the normal cervical lordosis which may be secondary to chronic muscle spasm," along with "preservation of the vertebral body

heights diffusely" and "[n]o acute or chronic fractures." (Tr. 1543.) Additionally, there was "mild to moderate disc space narrowing at C5-C7 with associated mild anterior and posterior endplate spurring at C5-C7, which is grossly unchanged," but "[n]o subluxation," while "[t]he odontoid process and lateral masses of C1 and C2 show[ed] gross alignment" with unremarkable prevertebral soft tissues. (Tr. 1543.) The lateral view, however, "demonstrate[d] a new rounded circumscribed 1.3 cm hyperdense or calcified nodular density overlying the facet joints of C7-T1" that was "not seen on the frontal view of the cervical spine." (Tr. 1543.) The x-ray report stated that this "may be an overlying soft tissue artifact versus a new bone lesion in the posterior elements at C7-T1," but clinical correlation was needed. (Tr. 1543.) X-rays were taken that same day for evaluation of Claimant's scoliosis. (Tr. 1545.) The impression was no acute bony pathology; no spondylolisthesis or spondylolysis of the thoracolumbar spine; mild ten-degree dextroscoliosis of the thoracic spine; no significant scoliotic curvature of the lumbar spine; and both congenital and acquired canal and foraminal stenosis at L4-S1. (Tr. 1545.) The x-ray report recommended an MRI of the lumbar spine for further evaluation if clinically indicated. (Tr. 1545.)

An MRI was ordered, and the September 27, 2020 MRI of the cervical spine indicated "reversal of normal cervical lordosis consistent with muscle spasm" with narrowed disc spaces at the C5-C6 and C6-C7 levels and disc degeneration. (Tr. 1541-1544.) The C5-C6 disc level "showed central and paracentral disc protrusion," while the C6-C7 disc level "showed right paracentral disc protrusion extending to [the] right naural foramen." (Tr. 1541.) There was no cord compression or metastasis. (Tr. 1541.) The impression from an MRI of the lumbar spine on the same date showed no fracture or spondylolisthesis. (Tr. 1544.) There was, however, narrowed disc space at the L4-L5 level

with disc degeneration; additionally, the L3-L4 disc level "showed central disc protrusion with central canal stenosis," the L4-L5 disc level "showed small right paracentral disc protrusion," the L5-S1 disc level "showed small central disc protrusion," and there was a "1.6 cm arachnoid cyst" in the sacral spinal canal. (Tr. 1544.)

On November 17, 2020, Claimant followed up with family-medicine physician Matthew S. Haag, D.O., to review the medical-imaging results. (Tr. 1575-76.) Dr. Haag performed a steroid-injection procedure in the left sacroiliac joint. (Tr. 1576.) Claimant followed up with Dr. Haag on November 17, 2020, where he prescribed Meloxicam and ordered a course of physical therapy for Claimant's "chronic cervical spasms and for lumbar stabilization program." (Tr. 1563.)

## ii. *Other Physical Conditions*

Claimant submitted evidence of additional medical conditions. First, Claimant has a history of generalized epilepsy and the record shows she received treatment for this condition in 2015 and 2016. Claimant experienced a seizure on May 3, 2015, and presented to neurologist Barry K. Vaught, M.D. the following week. (Tr. 658.) Claimant reported that her first seizure occurred at age fifteen, and between the ages of fifteen and twenty-nine she experienced approximately five seizures. (Tr. 655.) She reported that the most recent seizure was the first she had experienced in nine years. (Tr. 658.) She reported that the Depakote medication that had been prescribed for her epilepsy condition caused some weight gain. (Tr. 658.)

Subsequently, Claimant reported another seizure on March 7, 2016. (Tr. 717, 743, 1415.) CT imaging of Claimant's brain from that date was unremarkable, and an electroencephalogram ("EEG") was negative for abnormal brain activity. (Tr. 743.) From

2016 through the date of the ALJ's decision, Claimant did not have any further reports of seizures and her condition was noted to be controlled by medication. (Tr. 743-44.)

On September 6, 2016, Claimant presented to Surgical Care of Southern West Virginia reporting problems with constipation, gallbladder disorder, nausea, vomiting, and abdominal pain. (Tr. 1042-43.) She was scheduled for a cholecystectomy, or surgical removal of the gallbladder, which occurred on September 13, 2016. (Tr. 1043.)

On November 16, 2016, Claimant presented to Robin Adkins, N.P., reporting continued symptoms of frequent heartburn and reflux at night. (Tr. 1110-1112.) She was diagnosed with gastroesophageal reflux disease ("GERD") and referred to gastroenterology. (Tr. 1111.) N.P. Adkins completed a form for Claimant's short-term disability insurance claim and instructed Claimant to follow up. (Tr. 1111.)

Claimant was also treated for radial tunnel syndrome, which is akin to carpal tunnel syndrome but affects the radial nerve. An electromyogram-nerve conduction study of the upper extremities showed mild median neuropathy. (Tr. 1309.) Although Claimant had positive Durkan's of the radial tunnel proximal and positive Tinel's sign at times, other examinations showed that she could make a fist, write, and pick up coins without any difficulty. (Tr. 1297, 1415.) Although she had pain with strength testing of her hands at an April 2019 consultative examination, she demonstrated a 4/5 grip strength. (Tr. 1416.) Claimant did not undergo surgery for this condition.

On February 17, 2020, Claimant presented to her primary-care provider, Angela Elkins, PA-C, at Beaver Family Clinic with symptoms of chest pain and edema, or swelling, in her lower extremities. P.A. Elkins diagnosed Claimant with peripheral vascular disorder and advised her "to wear compression stockings as previously prescribed." (Tr. 1515.)

### iii.  *Mental-Health Conditions*

Claimant also asserted limitations due to problems with depression, anxiety, and post-traumatic stress disorder ("PTSD"). Claimant presented to Andrey S. Stojic, Ph.D., M.D., at the Cleveland Clinic Neurological Institute on April 26, 2016 for evaluation. (Tr. 715-724.) Claimant reported to Dr. Stojic that she had been treated for depression since approximately January 2015, and was prescribed Lexapro. (Tr. 718.) She reported suicidal thoughts, but no accompanying plan to hurt herself. (Tr. 718.) Additionally, Claimant reported that her primary-care provider had made a referral to a psychiatrist. (Tr. 718.) Dr. Stojic noted that Claimant was cognitively intact, with no active suicidal ideation. (Tr. 718.) He noted his agreement "with local referral to psychiatry for medication management"—as Claimant reported she was not responding to her Lexapro medication—and that "the patient may benefit from counseling as well in addition to change in pharmacotherapy." (Tr. 719.)

On July 8, 2016, Claimant returned to her primary-care provider for follow-up. (Tr. 1158.) Claimant complained of anxiety, stress at home, financial stress, and stress at work, reporting that she was upset and anxious because she was "put off from her job" for ninety days due to missing an excessive number of workdays. (Tr. 1158.) Claimant requested "something to calm her nerves down." (Tr. 1160.) She reported she had taken Lexapro in the past and reported feeling more depressed on this; however, she refused any other antidepressants and instead requested "something like Ativan to take daily." (Tr. 1160.) Claimant's provider determined that was not the best option for Claimant's generalized anxiety and instead prescribed Vistaril. (Tr. 1160.)

On September 6, 2016, Claimant presented to Surgical Care of Southern West Virginia for stomach pain; on examination, she was noted to have good judgment with

normal mood and affect and she was oriented to time place in person. (Tr. 1042-43.) On September 30, 2016, Claimant returned to her primary-care provider. (Tr. 1121.) She reported tension headaches and stomach problems, but the examination was negative for anxiety or depression. (Tr. 1121.) Claimant expressed that she felt she was able to return to work at that time. (Tr. 1123.) Similarly, Claimant returned to her primary-care provider on October 26, 2016; on examination, Claimant was oriented with intact memory, insight and judgment, as well as a normal mood and affect. (Tr. 1114-1115.)

On December 14, 2016, Claimant related a personal history of depression to neurosurgeon Dr. Ignatiadis. (Tr. 1101.) Claimant reported feelings of depression, but denied recent feelings of helplessness or hopelessness, denied recent feelings of low self-esteem or self-worth, and denied recent thoughts of harming herself. (Tr. 1101.) Claimant reported that she could perform the activities of daily living independently. (Tr. 1101.) On examination, Claimant was noted to be oriented to time, place, and person, with an intact memory and fluent speech. (Tr. 1101.)

On November 16, 2018, Claimant presented to Angela Elkins, PA-C, where it was noted that Claimant continued taking Flexeril and Neurontin once daily; Claimant's mental status was noted to be alert, with a normal affect, normal speech, normal thought content, and normal perception. (Tr. 1362-63.)

On March 16, 2020, Claimant presented to the Southern West Virginia Clinic for follow-up on her complaints of anxiety and depression; she reported compliance with her medications and denied any side effects. (Tr. 1517-1519.) She was prescribed Vistaril and advised that it has a side effect of sedation. (Tr. 1521.) When she presented for follow-up on April 20, 2020, however, Claimant reported that she had "been compliant with [her] current medication regiment without any side effects." (Tr. 1526.) At her June 18, 2020

14

follow-up appointment, Claimant again reported that she had "been compl[ia]nt with [her] current medication regimen without any side effects." (Tr. 1531.)

Licensed psychologist Lawrence J. Richmond, M.A. ("Richmond"), completed a psychological examination of the Claimant and submitted a report on June 24, 2020. (Tr. 70.) Richmond found Claimant's behavior, level of consciousness, insight, judgment, thought content, speech, and orientation were all within normal limits. (Tr. 72.) However, he found that Claimant was "unable to control" her "excessive amounts of anxiety . . . more days than not about numerous events." (Tr. 72.) Richmond associated Claimant's anxiety with symptoms of restlessness, fatigue, inattention, irritability, muscle tension and sleep disturbances. (Tr. 72.) He associated Claimant's complaints of depression with symptoms of anhedonia, fatigue, sleep issues, somatic concerns, and hopeless feelings. (Tr. 72.) Richmond opined that since 2015, Claimant has developed "severe levels of anxiety and depression[.]" (Tr. 73.) Without elaborating, Richmond also opined that Claimant "suffers from PTSD secondary to severe trauma that she was not able to discuss given the severity" and that Claimant "was unable to divulge the stressors given the severe nature of these." (Tr. 72.) His treatment plan recommended twenty sessions of cognitive-behavioral therapy, with an unknown prognosis for treatment "given this early stage of evaluation/treatment though guarded[.]" (Tr. 73.) Claimant's medical records from this treatment date include a one-sentence letter to Claimant signed by Richmond that stated "[t]oday during our session I found that you do suffer from ADHD in addition to depression, anxiety and PTSD." (Tr. 77.) The medical records do not elaborate on Richmond's stated ADHD diagnosis.

On July 30, 2020, Claimant presented to Dr. Zinzuwadia reporting "difficulty sleeping [and] trouble maintaining focus on one task." (Tr. 1537-38.) Claimant denied

symptoms of fatigue or an abnormal sleep pattern. Dr. Zinzuwadia noted that Claimant "was diagnosed with PTSD/ADHD." (Tr. 1537.) She added "unspecified" PTSD to her list of diagnoses, and her treatment plan was to order a "Psychiatry Referral." (Tr. 1539.)

Claimant presented to Richmond for six cognitive-behavioral therapy sessions for her PTSD, depression, and anxiety, on August 17, 2020, September 14, 2020, February 12, 2021, February 26, 2021, March 9, 2021, and March 24, 2021. (Tr. 78, 80, 84, 86, 88, 90.) The progress notes from these dates are largely identical, and state little aside from merely noting that Claimant's prognosis had not changed. Claimant canceled her appointments on January 15, 2021, April 9, 2021, and April 20, 2021, after which there are no further records of treatment with Richmond. (Tr. 83, 92, 93.)

### C. Consultative Evaluations

On April 28, 2017, Katherine Marshall, M.S. of Aspire Occupational Rehabilitation conducted a psychological consultative evaluation. (Tr. 1240.) Marshall conducted a review of records, followed by a clinical interview and mental status examination as part of the assessment. (Tr. 1240.) During the interview, Claimant reported she had problems with standing, sitting, and walking due to pain. (Tr. 1240.) Claimant denied any abuse or trauma as a child. (Tr. 1241.) Claimant reported that she was independent in all activities of personal grooming and showered daily. (Tr. 1245.) She was independent at most household chores with some assistance from her parents. (Tr. 1245.) She reported that she drove herself to the appointment that day; further, Claimant reported taking herself to the store as necessary, dining out, visiting her mother and friends, talking on the telephone, watching television, keeping medical appointments, and maintaining a checking account by herself. (Tr. 1240-45.) She reported weight loss, as well as returning to work. (Tr. 1245.) On examination, Claimant's judgment and insight—as well as her

immediate, recent, and remote memory—were all within the average range, and Claimant was noted to have completed all tasks with persistence and a fast pace. Marshall diagnosed Claimant with generalized anxiety disorder with the associated symptoms of worry, restlessness, fatigue, difficulty concentrating, irritability, muscle tension, and sleep disturbance. (Tr. 1241.) Marshall also diagnosed Claimant with panic disorder with associated symptoms of recurrent unexpected panic, attacks with palpitations, shortness of breath, chest pain, abdominal distress, and heat sensations, as well as persistent worry about having seizures and avoiding situations that may trigger a seizure. (Tr. 1244-45.)

On May 17, 2017, Robert Weisberg, M.D., a state agency medical consultant, reviewed Claimant's medical records and opined that she could lift up to fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit for about six hours in a workday; frequently climb ramps and stairs, stoop, balance, kneel, and crouch; occasionally crawl and climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to extreme cold and vibration as well as avoid even moderate exposure to hazards. (Tr. 148-49.) In October 2017, Pedro Lo, M.D., reviewed Claimant's medical records at the reconsideration level and endorsed Dr. Weisberg's assessment. (Tr. 182-83.)

Jimmy Adkins, P.A., submitted a report based on his consultative examination of Claimant on April 3, 2019. P.A. Adkins opined that Claimant had chronic cervical and dorsal spine strain, scoliosis, epilepsy, and radiculopathy. As to Claimant's limitations, P.A. Adkins opined that Claimant could occasionally reach with her right hand, frequently reach with her left hand, and perform all other activities with both hands frequently; frequently lift up to ten pounds; occasionally lift up to twenty pounds; occasionally carry up to ten pounds; sit for twenty minutes at a time; stand for fifteen minutes at a time;

walk for thirty minutes at a time; sit for a total of three hours in an eight-hour workday; stand for up to two hours in an eight-hour workday; and walk for up to two hours in an eight-hour workday. (Tr. 1419-20.) Additionally, P.A. Adkins opined that Claimant could ambulate without an assistive device; perform activities like shopping; walk a block at a reasonable pace; sort, handle, and use paper or files; and prepare simple meals. (Tr. 1424.)

### D. Hearing Testimony

At the April 7, 2021 hearing before the ALJ, Claimant testified that she had not worked since 2016. (Tr. 98.) Claimant stated that she had not had any seizures since 2016. (Tr. 98.) She testified that her psychiatric medications caused agitation, trouble sleeping, and "some aggressive behavior." (Tr. 101.) Additionally, Claimant stated that injections administered to her lower back did not alleviate the pain caused by her degenerative disc disease, and physical therapy was also unsuccessful. (Tr. 102.) With respect to her carpal tunnel syndrome, Claimant testified she had some tingling, numbness, and a locking joint in her right hand; however, she had not received any additional treatment. (Tr. 102.) Claimant described a typical day, during which she would take a hot bath due to lower-back stiffness; make breakfast and take her medicine; wash dishes; make her bed; and watch television. (Tr. 103-104.) Claimant stated that she usually had to lie down three to four times per day; that she did not "get out" often due to the pandemic; and that she had her groceries delivered. (Tr. 104.) Additionally, Claimant testified that side effects from her medication—which included drowsiness, nausea, and gastrointestinal problems— negatively impacted her ability to focus or concentrate. (Tr. 104.)

Vocational Expert ("VE") William Tanzey also testified at the April 7, 2021 hearing before the ALJ. VE Tanzey summarized Claimant's past work during the relevant time

period; he classified Claimant's past work as a cashier as semi-skilled, at the light exertional level, and he classified Claimant's past work as a toll collector as unskilled, at the light exertional level. (Tr. 105-106.) The ALJ then asked VE Tanzey to consider a hypothetical individual who shared the Claimant's age, education, and work history, with the following limitations:

> [T]his hypothetical [individual] can lift ten pounds occasionally . . . [and] less than ten pounds frequently[,] [s]tand and walk two hours in an eight-hour day, and sit at least six hours in an eight-hour day. This hypothetical individual is limited to occasional pushing and pulling with the right dominant extremity . . . can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance and stoop, never kneel crouch and crawl[;] [c]an occasionally reach overhead . . . [a]nd frequently reach in all other directions . . . [c]an frequently, but not continuously handle, finger, and feel . . . [and] can tolerate occasional exposure to extreme temperatures, vibrations, and hazards.

(Tr. 106.) VE Tanzey testified that the hypothetical individual described by the ALJ could not perform past work, but that there would be other work at the sedentary physical demand level such as the positions of surveillance monitor, order clerk, and telephone quotation clerk. (Tr. 106-107.)

### E. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no

finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's [RFC]" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If the claimant does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that

the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him or her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, the ALJ will find him or her "disabled." *Id.*

Applying the sequential evaluation process in this case, ALJ Tilley concluded that Claimant had not engaged in substantial gainful activity since June 2, 2016, the amended alleged onset date. (Tr. 49.) The ALJ found that Claimant's degenerative disc disease of the lumbar spine with chronic strain, degenerative disc disease of the cervical spine with chronic strain, cervicalgia, radial tunnel syndrome, carpal tunnel syndrome, cervical polyradiculopathy affecting the right arm, and obesity constituted "severe" impairments. (Tr. 49.) However, the ALJ found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 52.)

Upon assessing Claimant's RFC, the ALJ determined that Claimant has the residual functional capacity to perform sedentary work but with the following limitations: Claimant is able to lift and carry ten pounds occasionally, and less than ten pounds frequently; Claimant is able to stand and walk two hours in an eight-hour workday; Claimant is able to sit at least six hours in an eight-hour workday; Claimant is able to push and pull with the right dominant upper extremity occasionally; Claimant is able to climb ramps and stairs, balance, and stoop occasionally; Claimant should never climb ladders, ropes, or scaffolds; Claimant should never kneel, crouch, or crawl; Claimant can reach

overhead occasionally, but can reach in all other directions frequently; Claimant can handle, finger, and feel bilaterally frequently; Claimant can tolerate exposure to extreme temperatures, vibrations, and hazards occasionally. (Tr. 53.)

Because she determined that Claimant was limited to sedentary work, the ALJ found that Claimant could not perform any of her past relevant work. (Tr. 57.) The ALJ further characterized Claimant as "a younger individual" with "a high school education," and noted that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Claimant is not disabled," regardless of the transferability of Claimant's job skills. (Tr. 57.) The ALJ enlisted a vocational expert ("VE") to aid in finding that Claimant is capable of working as a Surveillance Monitor, Order Clerk, or Telephone Quotation Clerk. (Tr. 58.) As a result, the ALJ concluded that Claimant had not been under a disability from June 2, 2016—Claimant's amended onset date—through the date of the ALJ's June 8, 2021 decision.  (Tr. 58.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.*

(alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589). Thus, in undertaking this review, the Court considers whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence. *Cannon v. Comm'r of Soc. Sec. Admin.*, 21-2042, 2023 WL 2147306, at \*6 (4th Cir. Feb. 22, 2023) (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)).

## III.   ANALYSIS

### A. Opinion Evidence

Claimant first argues that the ALJ erred in assessing the "nature and severity" of Claimant's impairments by failing to give appropriate consideration and substantial weight to the opinions of Claimant's "treating physicians" regarding Claimant's diagnoses of peripheral vascular disease ("PVD"), post-traumatic stress disorder ("PTSD"), sciatic leg pain, and varicose veins. (ECF No. 14 at 2.) In support of her argument, Claimant pointed to specific medical records which she asserts contain the opinions of her treating providers Bella Zinzuwadia, M.D., Nanda Rajesh, M.D., and Angela Elkins, P.A. *See id.*

The ALJ certainly must consider all of the record evidence in formulating her decision, and she is required to include in her written decision a discussion assigning greater or "controlling" weight to the medical opinions of Claimant's treating physicians "unless there is persuasive contradictory evidence." *Cannon*, 2023 WL 2147306, at \*7

(citing *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983)). An ALJ is not required, however, to automatically afford weight to every statement or notation made in a claimant's medical records by any healthcare provider whatsoever. *See Davenport v. Comm'r of Soc. Sec.*, 13-cv-739, 2013 WL 5883462, at *2 (D. Md. Oct. 29, 2013). Instead, the applicable regulations carefully define what kinds of statements—and by whom—the ALJ must weigh in her written analysis: namely, *medical opinions. See Cannon*, 2023 WL 2147306, at *7 (explaining that, under the applicable regulations, the ALJ "will evaluate every *medical opinion*") (emphasis added). The regulations define "medical opinions" as "statements from *acceptable medical sources* that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." *See* 20 C.F.R. § 404.1527(a)(1) (emphasis added).

First, Claimant asserted that "Dr. Bella Zinzuwadia, MD, gave a diagnosis of peripheral vascular disease." (ECF No. 14 at 4 (citing Tr. 1516).) In support of her argument, Claimant pointed to a medical record from February 17, 2020. (Tr. 1516.) Notably, Claimant did not point to any other evidence or submit any further argument aside from the fact of her diagnosis.

Review of the February 17, 2020 record shows that Angela Elkins, PA-C—not Dr. Zinzuwadia—diagnosed Claimant with peripheral vascular disease ("PVD"). This fact is significant because, as noted above, the regulations define "medical opinions" as "statements from acceptable medical sources[.]" 20 C.F.R. § 404.1527(a)(1). The "acceptable medical sources" who may render "medical opinions" are defined narrowly to encompass only (1) licensed medical or osteopathic doctors, (2) licensed or certified psychologists, (3) licensed optometrists, (4) licensed podiatrists, and (5) qualified speech-

language pathologists. 20 C.F.R. §§ 404.1502, 416.902. As this Court explained in *Smith v. Colvin*, "[t]he rules for evaluating acceptable medical source statements and opinions do not apply, therefore, to statements and opinions of [other sources such as] physicians' assistants." *Smith v. Colvin*, 1:13-cv-15029, 2014 WL 4656122, at *9 (S.D. W. Va. Sept. 16, 2014). "ALJs may consider any opinions of physicians' assistants as additional evidence, but they are not required to assign them weight, controlling or otherwise, in their evaluations of evidence" so long as the ALJ's discussion of the evidence permits the reviewer to follow the ALJ's reasoning. *Id.* (citing *Yost v. Barnhart*, 79 Fed. App'x 553, 555 (4th Cir. 2003); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)). As a physician's assistant, P.A. Elkins therefore does not meet the definition of an acceptable medical source under 20 C.F.R. § 404.1502 or 20 C.F.R. § 416.902—and the ALJ was not obligated to assign any weight to P.A. Elkins's opinion. *Smith*, 2014 WL 4656122, at *9.

Furthermore, Claimant has at most demonstrated harmless error. Even when a treating provider's statement satisfies the definition of a medical opinion, that statement is not automatically entitled to controlling weight. *Stormo v. Barnhart*, 377 F.3d 801, 805 (8th Cir. 2004) (determination that a provider's statement constitutes a medical opinion from an acceptable medical source "is not the end of the inquiry"). Standing alone, a medical diagnosis is insufficient to establish disability; "[t]here must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Here, Claimant has neither pointed to any record evidence, nor sought to explain how her PVD diagnosis corresponds to any functional limitations or restrictions. The February 17, 2020 record indicates that Claimant presented to P.A. Elkins with a complaint of edema, or swelling, in her lower extremities; the record is devoid, however, of any statements—by P.A. Elkins, Dr. Zinzuwadia, or otherwise—about any impairments,

restrictions, or other limitations affecting Claimant as a result of the PVD diagnosis or its associated edema. To the contrary, P.A. Elkins advised Claimant simply "to wear compression stockings as previously prescribed." (Tr. 1515.) Without this showing of related functional loss, affording controlling weight, partial weight, or no weight to Claimant's PVD diagnosis would have no impact on the ALJ's disability determination. *See Tanner v. Comm'r of Soc. Sec.*, 602 Fed. App'x 95, 101 (4th Cir. Feb. 12, 2015) (finding that the ALJ's failure to assign weight to a medical opinion was harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability").

Next, Claimant asserted that Dr. Zinzuwadia "gave a diagnosis of . . . sciatic leg pain." (ECF No. 14 at 4 (citing Tr. 1539).) In support of her argument, Claimant pointed to a medical record from July 30, 2020. (Tr. 1539.) Once again, Claimant did not point to any other evidence or submit any further argument aside from the fact of her diagnosis. Nor did she address how the diagnosis of sciatic leg pain corresponds to any functional limitations or restrictions. Just like Claimant's PVD diagnosis, discussed above, without a showing of related functional loss, the ALJ's failure to assign weight to Dr. Zinzuwadia's opinion is mere harmless error. *Tanner*, 602 Fed. App'x at 101.

Next, Claimant asserted that Dr. Zinzuwadia "gave a diagnosis of . . . post-traumatic stress disorder." (ECF No. 14 at 4 (citing Tr. 1539.) In support of her argument, Claimant pointed to the same medical record from July 30, 2020. (Tr. 1539.) First, this record is not a "medical opinion" as defined by the regulations, because it does not reflect Dr. Zinzuwadia's own judgments about the nature and severity of Claimant's impairments. *See* 20 C.F.R. § 404.1527(a)(1) (limiting the definition of a "medical opinion" to statements that "reflect judgments about the nature and severity of [a

claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions"). The July 30, 2020 record shows that Dr. Zinzuwadia noted passively that Claimant "*was diagnosed* with PTSD/ADHD," ostensibly referring to licensed psychologist Lawrence J. Richmond's June 24, 2020 report of Claimant's psychological examination where he found that Claimant has ADHD, depression, anxiety, and PTSD. (Tr. 70-77, 1537 (emphasis added).) Dr. Zinzuwadia noted that Claimant reported "difficulty sleeping," and "trouble maintaining focus on one task," but also that Claimant denied fatigue and denied an abnormal sleep pattern. (Tr. 1537-38.) Dr. Zinzuwadia made no specific findings as to these symptoms, and merely added "unspecified" PTSD to her list of diagnoses. *Id.* Dr. Zinzuwadia's treatment plan from this date was to order a "Psychiatry Referral." (Tr. 1539.) The record is devoid of any statements by Dr. Zinzuwadia about the severity of Claimant's PTSD, her prognosis, or any impairments, restrictions, or other limitations specific to Claimant as a result of the PTSD diagnosis.

Further, Claimant once again did not point to any other evidence or submit any further argument aside from the fact of her diagnosis. She failed to address how her PTSD diagnosis corresponds to any functional limitations or restrictions. Accordingly, just like Claimant's other diagnoses discussed above, without a showing of related functional loss the ALJ's failure to assign weight to Dr. Zinzuwadia's opinion is mere harmless error. *Tanner*, 602 Fed. App'x at 101.

Finally, Claimant argued that the ALJ erred in failing to weigh the purported statements of Nanda Rajesh, M.D.; in support, Claimant pointed to the medical record from her July 29, 2015 visit to the emergency department of Beckley ARH Hospital where she was diagnosed with varicose veins. (ECF No. 14 at 4 (citing Tr. 942).) Claimant asserts

that "Dr. Rajesh . . . gave a diagnosis that I, the claimant, do not stand or sit in one position for long periods of time[;] [d]o not sit with my legs crossed[;] [and] [r]est with my legs raised during the day." *Id.*

Not only does this July 29, 2015 record predate Claimant's alleged onset date, but it also fails to meet the definition of a "medical opinion." The Claimant presented to the emergency department for chest pain and was diagnosed with varicose veins. (Tr. 942.) While Dr. Rajesh is listed as Claimant's attending physician on the July 29, 2015 record highlighted by Claimant, the substance of the document is limited to "Discharge Instructions" that are expressly attributed to a 2009 publication by ExitCare, LLC, rather than a representation or statement made by Dr. Rajesh. (Tr. 942.) The Discharge Instructions explain that varicose veins "are veins that have become enlarged" due to increased pressure. (Tr. 942.) The instructions generally advise patients to refrain from standing for long periods; refrain from sitting with crossed legs; to rest with raised legs during the day; and to wear elastic stockings or support hose. (Tr. 942.) Nothing in the chart entry contains any statement by Dr. Rajesh reflecting any judgments about the nature and severity of Claimant's varicose veins, including any statement whatsoever regarding limitations specific to Claimant as a result of her varicose veins. Accordingly, the July 29, 2015 medical record highlighted by Claimant does not constitute a "medical opinion" withing the definition set forth in the regulations. *See Alexandrowski v. Comm'r of Soc. Sec.*, 3:20-cv-2302, 2021 WL 8342812, at *12 (N.D. Ohio Nov. 18, 2021) (noting that, because a document containing discharge instructions did not say what the claimant could do in spite of her injury, the instructions did not meet the definition of a "medical opinion" and therefore were not entitled to any weight").

In summary, Claimant failed to demonstrate that the ALJ improperly weighed the medical opinion of an acceptable medical source. Further, even if the statements Claimant identified had satisfied the definition of a medical opinion by an acceptable medical source, Claimant nonetheless failed to demonstrate harmful error. None of the diagnoses highlighted by Claimant overcome the substantial evidence that supports the ALJ's analysis. The ALJ extensively detailed the consistent examination findings which revealed that Claimant exhibited normal gait, intact sensation, and normal muscle strength with no atrophy. (Tr. 54-56, 1047-48, 1100, 1108, 1267, 1400, 1415, 1444, 1484.) While Claimant had pain and back spasms, the ALJ pointed to Claimant's "high functioning" activities of daily living, which the ALJ found was inconsistent with Claimant's representations about the intensity, persistence, and limiting effects of her symptoms. (Tr. 54.) The ALJ recognized that Claimant had pain and included significant limitations in her RFC assessment, tying those limitations to record evidence and explaining the weight afforded to the relevant medical opinions. (Tr. 56.) As the ALJ's decision logically and methodically outlined her reasoning for determining that Claimant was not disabled, with specific citations to substantial supporting evidence in the record that sufficiently allows the Court to follow the ALJ's reasoning. None of the records highlighted by Claimant were indicative of a related functional loss that accompanied her diagnoses. *Gross*, 785 F.2d at 1166. Accordingly, the undersigned **FINDS** that Claimant failed to demonstrate reversible error.

### B. Listing 1.15

Next, Claimant argues that the ALJ erred in finding that Claimant's degenerative-disc disease did not meet the requirements of Listing 1.15, which deals with disorders of the skeletal spine. (ECF No. 14 at 3.) Specifically, the ALJ found that "Listing 1.15 is not

met" in this matter "because there is no evidence of imaging consistent with the compromise of a nerve root in the cervical or lumbosacral spine." (Tr. 52.)

In support of her argument that the ALJ committed reversible error in finding that Listing 1.15 was not satisfied, Claimant correctly points out that the ALJ found no evidence of muscle spasms of the cervical spine (Tr. 55), yet an MRI report from September 27, 2020 indicated "[t]here is reversal of normal cervical lordosis consistent with muscle spasm." (Tr. 1541.) The ALJ also inaccurately stated that "imaging of the lumbar and cervical spine showed  . . . no evidence of nerve root compression." (Tr. 52.) To the contrary, Claimant's medical records show that Andrew Thymius, D.O. assessed her for neck pain on May 24, 2017; Dr. Thymius's Progress Note from that examination expressly states that "[i]maging of the cervical spine reveals disc pathology resulting in nerve root irritation/compression" and that "the patient's examination findings correlate with their MRI findings of disc pathology[.]" (Tr. 1250-51.)

Despite these inaccuracies, Claimant has nonetheless failed to demonstrate that she is entitled to relief under the circumstances. To establish a disability under Listing 1.15, Claimant was required to present evidence demonstrating that she met *all four* criteria of the listing:

A.    Neuro-anatomic (radicular) distribution of one or more of the following symptoms consistent with compromise of the affected nerve root(s):

1.    Pain; or
2.    Paresthesia; or
3.    Muscle fatigue.

AND

B.    Radicular distribution of neurological signs present during physical examination . . . or on a diagnostic test . . . and evidenced by 1, 2, and either 3 or 4:

1.     Muscle weakness; and
2.     Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root (see 1.00F2); and
3.     Sensory changes evidenced by:
    a.     Decreased sensation; or
    b.     Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or
4.     Decreased deep tendon reflexes.

AND

C.     Findings on imaging (see 1.00C3) consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.

AND

D.     Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:
1.     A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
2.     An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or
3.     An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, at Listing 1.15. Thus, while Claimant's evidence demonstrates that her degenerative-disc disease met Criterion "C," this is insufficient standing alone; she must also demonstrate that she met Criteria "A," "B," and "D." Claimant, however, has not addressed the remaining criteria at all.

Claimant's argument fails because, as the ALJ found, "not all requirements of these Listings can be demonstrated by the evidence of record." (Tr. 52.) As to Criterion "B," the ALJ explained that Claimant's physical examinations "have generally been unremarkable with no findings of muscle weakness, sensory changes, or decreased deep tendon reflexes." (Tr. 52.) Further, as to Criterion "D," the ALJ explained that consultative examiner Jimmy Adkins, P.A., noted in April 2019 that Claimant "ambulated with a normal gait and did not require the use of any handheld assistive device." (Tr. 55.)

Substantial evidence supports these findings. First, Claimant has not demonstrated any documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; a documented medical need for a one-handed, hand-held assistive device or a wheeled and seated mobility device involving the use of one hand with an inability to use one upper extremity; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, at Listing 1.15D.

Indeed, as the ALJ explained, although Claimant had tenderness at times, she regularly presented in no acute distress, with a normal gait and without the use of an assistive device, intact sensation, and normal muscle strength with no atrophy. (Tr. 54-56, 1047-48, 1100, 1108, 1237, 1267, 1400, 1415, 1444, 1484.) For instance, on December 14, 2016, Claimant was seen by Dr. Ignatiadis at St. Mary's Neurosurgery, where it was noted that Claimant "walked in without any assistance." (Tr. 1100.) In April 2017, Claimant was observed performing "excellent toe and heel walking." (Tr. 1237.) Subsequently on July 2, 2019, Deanna Conley, FNP-BC noted in her examination findings that Claimant's motor strength was "normal in all limbs," with no abnormal movements,

spasticity, or atrophy, and a normal gait and station. (Tr. 1438-39.) Likewise, on November 2, 2019, Darshan Dave, M.D., noted in his examination findings that Claimant's motor strength was "normal in all limbs" with "no abnormal movements." (Tr. 1429-30.) Moreover, as the ALJ noted, at an April 2019 consultative examination Claimant demonstrated 4/5 grip strength and was able to make a fist, write, and pick up coins with both hands without difficulty. (Tr. 55, 1414-15.)

Because the ALJ's finding that Claimant did not meet all of the requirements of Listing 1.15 is supported by substantial evidence, the undersigned **FINDS** that the ALJ did not commit reversible error despite her misstatements regarding Claimant's muscle spasms and nerve-root compression.

### C.  *Hypothetical Questions Posed to the Vocational Expert*

Next, Claimant argued that the ALJ erred by failing to include a specific functional limitation in her hypothetical question to the testifying Vocational Expert ("VE") William Tanzey at the April 7, 2021 hearing. (ECF No. 14 at 5-6.) The ALJ asked VE Tanzey to consider a hypothetical individual with the same age, education, and work history of the Claimant, who could, *inter alia*, "sit at least six hours in an eight-hour day." (Tr. 106.) In response, VE Tanzey testified that the hypothetical individual could perform other work at the sedentary physical demand level; the ALJ relied on this testimony in making her determination that Claimant was not disabled. (Tr. 58.) In support of her assertion that the ALJ erred, Claimant pointed to an insurance assessment form completed by state agency disability examiner Jimmy Adkins, P.A., wherein he indicated by a "check" mark—without elaboration—that Claimant could sit for a total of three hours in an eight-hour workday; P.A. Adkins's opinion restricted Claimant to three fewer hours of seating than the six hours advanced in the ALJ's hypothetical. (Tr. 1420.)

In determining whether a claimant can perform her past relevant work or adjust to other work at steps four and five of the sequential evaluation process, the ALJ may engage a VE to "offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s)" can still perform certain work despite these limitations. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see id.* §§ 404.1560(c), 416.960(c). The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record." *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)).

In her written decision, the ALJ explained that she only afforded "partial weight" to the seating limitation P.A. Adkins indicated on the insurance form, for two reasons. (Tr. 56.) First, the simple check-box format of the insurance form was devoid of any "rationale in support" of Adkins's three-hour seating limitation. (Tr. 56.) Further, the ALJ explained that the seating limitation was not credibly established in the record—and, in fact, was inconsistent with "the evidence taken as a whole." (Tr. 56.) The ALJ pointed to objective evidence that contradicted Adkins's assessment, including consistent examination findings that Claimant exhibited normal gait, intact sensation, and normal muscle strength with no atrophy. (Tr. 54-56, 1047-48, 1100, 1108, 1267, 1400, 1415, 1444, 1484.) Additionally, the ALJ emphasized Claimant's "high functioning" activities of daily

living, which supported Claimant's ability to perform sedentary work. (Tr. 56.) Moreover, state agency medical consultants Dr. Weisberg and Dr. Lo opined that Claimant could sit for about six hours in a work day. (Tr. 148-49, 182-83.) Thus, the seating limitation of six hours as set forth in the ALJ's hypothetical was supported by substantial evidence. Claimant failed to demonstrate that a three-hour seating limitation was "credibly established in the record." *Manley*, 2018 WL 3423821, at *3. Accordingly, the undersigned **FINDS** that the ALJ did not err.

### D. Claimant's Medications

Finally, Claimant argued that the ALJ erred in evaluating Claimant's complaints of pain because the ALJ failed to consider information pertaining to the type, dosage, effectiveness, and side effects of Claimant's daily medications. (ECF No. 14 at 5.) In support of her position, Claimant pointed to a disability-insurance form completed on May 1, 2017, by Angela Elkins, P.A., stating that "pain [physically] limits patient[']s ability to perform duty at work without significant increase in pain," while "[p]rescription therapy" for her pain "mentally restricts patient[']s ability to perform her job." (Tr. 1273.)

The Fourth Circuit rejected a similar argument in *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005). In that case, the claimant testified at a hearing before the ALJ that she suffered from constant pain throughout her body; further, she alleged that she suffered a disabling "doped up" effect as a result of her pain medications. *Id.* The Fourth Circuit explained that the *Johnson* claimant's description of the disabling effects of her medications was inconsistent with her testimony regarding her routine daily activities like house cleaning, cooking, managing her finances, and attending church. *Id.* (citing *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002) (finding that symptoms such as drowsiness that "often accompanies the taking of medication . . . should not be viewed as disabling

unless the record references serious functional limitations")). So long as substantial evidence supported the ALJ's assessment, the Fourth Circuit left it to the ALJ to resolve the conflicting evidence of the disabling effects of claimant's medications. *See id.*

Similarly, in the *Burns* opinion cited by the *Johnson* court, the claimant alleged that the ALJ erred in failing to take into account "the impact of the side effects of Burns' medication." *Burns*, 312 F.3d at 130. Like the Claimant in this case, however, the *Burns* claimant could only point to a "passing reference" to side effects from a single report. *Id.* In *Burns*, the ALJ had ordered Dr. Laviolette to evaluate the claimant's intellectual capacity; Dr. Laviolette's report mentioned in passing that Burns reported he did not "feel like he could handle stress real well without the medication, and he feels the medication makes him drowsy." *Id.* The *Burns* court found that the ALJ did not err in rejecting the claimant's assertion that he could not work due to the side effects from his medication, because the record contained "no significant complaints of side effects from medication," and "there was no medical evidence as to any physical limitations resulting from any side effects from medication." *Id.* The *Burns* court reasoned that "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Id.* at 131. Without any such evidence, the *Burns* court ruled that "the ALJ's decision to discount Burns' allegations of side effects was based on substantial evidence." *Id.*

Here, just like Dr. Laviolette's passing reference to side effects in his report, P.A. Elkins's passing reference to the disabling effects of Claimant's prescription medication on the insurance form is simply insufficient to demonstrate error. Even assuming—for the purposes of discussion only—that P.A. Elkins's statement constituted a medical opinion under the applicable regulations, an ALJ nonetheless may permissibly discount a treating

physician's opinion when the basis for it is not articulated. *See Slowik v. Comm'r of Soc. Sec.*, No. BPG-11-cv-1698, 2012 WL 3610774, at *2 (D. Md. Aug. 21, 2012); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that ALJ properly rejected "conclusory" opinion). In fact, P.A. Elkins's vague reference to "prescription therapy . . . mentally restrict[ing] patient's ability to perform her job" is even more tenuous than the report at issue in *Burns*, as it does not specify which of Claimant's medications "mentally restricts" the Claimant's ability to work, does not address the manner in which Claimant's medications reportedly limit her, and does not address P.A. Elkins's basis for making the statement. (Tr. 1273.)

The ALJ properly evaluated the record evidence in finding that Claimant's mental impairments "cause only minimal limitations in the claimant's ability to perform basic work activities." (Tr. 49.) Just like the ALJ in the *Johnson* case, who highlighted the claimant's extensive activities of daily living  like housecleaning, cooking, managing her finances, and attending church, the ALJ here pointed out that Claimant's described daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 56.) Specifically, the ALJ pointed out that the Claimant "reported that she is able to prepare her own meals, take care of personal grooming independently, wash dishes, do laundry, perform dusting, drive a car, shop in stores, manage finances, and spend time with others." (Tr. 56.)

Beyond the Claimant's own testimony regarding her activities of daily living, the ALJ pointed to Claimant's medical records and noted that "mental status evaluations in 2016 showed normal memory, attention span, concentration, fund of knowledge, mood, judgment, and insight." (Tr. 50.) The ALJ next pointed to Claimant's April 2017 psychological consultative evaluation with Katherine Marshall, M.S., where Marshall's

mental-status evaluation indicated that Claimant's judgment and insight—as well as her immediate, recent, and remote memory—were all within the average range, and Claimant was noted to have completed all tasks with persistence and a fast pace. (Tr. 50.) Finally, the ALJ pointed out that a June 2018 treatment note from Claimant's neurologist indicated that Claimant's mental status was normal. (Tr. 50.)

The ALJ's determination is supported by substantial evidence. Aside from PA Elkins's vague reference to "[p]rescription therapy mentally restrict[ing] patient's ability to perform her job" and Plaintiff's own testimony, nothing in the record regarding the dosage, effects, or side effects of Claimant's medications corroborates a finding of serious functional limitations. To the contrary, Claimant's medical records show that Claimant consistently denied any adverse prescription side-effects to her treating physicians, aside from weight gain. For instance, Claimant presented to Erica A. Hanshew, FNP-BC on June 4, 2018, for follow-up on her seizures, lumbar radiculopathy, paresthesia of skin, tension headaches, and cervical disc disorder; Claimant reported she was complying with her medications, and experienced no side effects. (Tr. 1353.) She was prescribed Flexeril and Neurontin and specifically advised of the side effects of these medications. (Tr. 1353.) Additionally, Claimant was instructed "to stop medication if [she] develop[ed] serious side effects and report [them] immediately." (Tr. 1353.)

On November 16, 2018, Claimant presented to Angela Elkins, PA-C, where it was noted that Claimant continued taking Flexeril and Neurontin once daily; Claimant's mental status was noted to be alert, with a normal affect, normal speech, and normal thought content/perception. (Tr. 1362-63.) On July 2, 2019, Claimant followed up with Deanna Conley, FNP-BC, where aside from reporting a forty-pound weight gain from her

Depakote medication, Claimant denied any side effects from her medications. (Tr. 1436-1438.)

Similarly, Claimant was seen by neurology on October 28, 2019, where it was noted that Claimant reported weight gain from her Depakote medication; however, Claimant reported no other side effects. (1426-1430.) On March 16, 2020, Claimant presented to the Southern West Virginia Clinic for follow-up on her complaints of anxiety and depression; she reported compliance with her medications and denied any side effects. (Tr. 1517-1519.) She was prescribed Vistaril and advised that it has a side effect of sedation. (Tr. 1521.) When she presented for follow-up on April 20, 2020, however, Claimant reported that she had "been compliant with [her] current medication regiment without any side effects." (Tr. 1526.) At her June 18, 2020 follow-up appointment, Claimant again reported that she had "been compl[ia]nt with [her] current medication regimen without any side effects." (Tr. 1531.) This is largely consistent with the undersigned's review of the record, where—aside from some weight gain, Claimant consistently reported little-to-no side effects with her medications. Just as in *Johnson*, therefore, substantial evidence supports the ALJ's assessment.

When an ALJ's analysis is supported by substantial evidence, it is not the Court's role to substitute its own judgment for that of the ALJ. Rather, it is the task of the ALJ to weigh conflicting evidence. That Claimant preferred a different outcome is of no moment. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig*, 76 F.3d at 589). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d

40

at 589). Put simply, the ALJ's comprehensive discussion carefully considered the evidence, made reasonable and supportable choices, and clearly articulated the ALJ's reasoning. The undersigned therefore **FINDS** no error.

*IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm her decision (ECF No. 19), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Volk.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation, to transmit a copy of the same to counsel of record, and to mail a copy to Plaintiff at her address of record.

Enter:      February 27, 2023

Dwane L. Tinsley
United States Magistrate Judge